The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. The first case for argument this morning is 19-1463, California Ridge Wind Energy v. United States. Mr. Hayes, whenever you're ready. Thank you, Your Honor, and may it please the court. This case involves two very large wind farms that were developed over a seven-year and a four-year period, respectively. The development efforts occurred in accordance with two transactions, so-called development agreements, by which the project companies, Bishop Hill and California Ridge, agreed to pay fees of $60 million and $50 million, respectively, to the developers in return for development services. There's no question that under the terms of these fee-for-service agreements, the services were provided. Two wind farms, each producing in excess of 200 megawatts of electricity, operate in southern Illinois to this day. The Tucker Act case was brought after the Treasury Department reduced the amount of the grants the project companies were entitled to receive under Section 1603. The government did not defend that arbitrary reduction at trial. The case was tried over four days, during which the plaintiff called 10 witnesses and put in evidence a significant number of documents, evidence even the trial court called abundant. The plaintiff's testimonial and documentary evidence was largely uncontroverted. The trial court's opinion is seven pages long. Its factual findings, such as they are, were not sufficient to comply with Rule 52 or permit meaningful appellate review. Thank you. Counsel, this is Judge Toronto. Can I ask you a question? Certainly, Ron. Sure. One of the things I guess I'm a little bit uncertain about is this. If the answer to that is the Court of Federal Claims had enough evidence to find that, why is it necessary to talk about language like sham? Well, Your Honor, let me respond first by saying that I think there is a great deal of evidence in the record which establishes that the fees charged for the development services were appropriate. By which I mean within a commercially acceptable range. So, for example... I guess I want to understand whether one needs even to address any language about sham if, and I know you're going to contest this if, but as a legal matter, do we need to discuss sham if the findings would support the conclusion that the $50 and $60 million figures are simply not reliable indicators of the development costs? Well, Your Honor, you're quite right. I would contest a conclusion that they were not reliably and accurately measuring the development costs. Having said that, the party's focus on the two issues obviously flows from the opinion of the trial court, which I would submit is primarily based on its sham transaction analysis. But why wouldn't we read the trial court's focus on sham as simply meaning, at least, and maybe this is therefore legally enough, that when there's a round-trip money circle and when the contracts are entered into after, in one case, apparently all of the services, and in the other case, almost all of the other services, and when the contract has a kind of three-clause, single-sentence description, that all that taken together simply allows the finding that the taxpayers here did not meet their burden of showing that those two dollar amounts are reliable indicators of the actual development costs? Well, Your Honor, I think it's inappropriate to reach that conclusion because there is abundant evidence – first of all, let me back up and say the evidence is that the transactions had business purpose and substance. The transactions were the development agreements by which the project companies agreed to make payments of development fees in return for the development of two wind farms. That's precisely what occurred, and there's no evidence to the contrary. There's also evidence that the amount of the development fees were consistent with fair market value, as testified to by the plaintiff's expert, and uncontradicted by the government, uncontroverted, the government offered no evidence to refute that proposition whatsoever. Further, the notion that the timeline is such that the development of Bishop Hill begins in 2005 and is completed in 2012. The development agreement is entered into in the early part of 2012. With regard to California Ridge, the development of the project begins in 2008, as the evidence shows, and is concluded in 2012. The development agreement is entered into in 2011. The evidence also demonstrates that the development activity was ongoing and not completed at the time the two development agreements were entered into. The notion that somehow these development agreements are after the fact renditions is not supported by the record and, of course, not referenced in any way, shape, or form in the trial court opinion. I'm not sure, Your Honor, I'm answering your question, but I'm trying to. As we pointed out in our briefs, in particular our reply brief, there's a great deal of evidence in this case completely ignored by the trial court, which establishes that while there were wire transfers in a single day, the underlying economic reality and substance of those transactions was different than the superficial picture the government tries to paint based simply on the wire transfers and the fact that they occurred in a day. Counsel, if you were paying attention to what I understood Judge Toronto was talking about, and I have the same concern, leaving aside the circular transaction and the timing of it, there's also focus in the Court of Federal Claims' opinion that goes to the point Judge Toronto made, that there was no reliable indicator of the actual development cost. And the Court of Federal Claims' judge did reach that conclusion. He cited some of the testimony by Brian Shuler and others, and even the Deloitte accountant guy, that failed to give a reliable indication of the actual cost of development. I assume you disagree with what I've said, so tell me why I'm wrong. Well, with all due respect, Your Honor, the government didn't contest any of the development costs except the fee. They're all stipulated. There's no dispute about the development costs in either one of these cases. They're stipulated by the government. The only cost, the only cost... Well, we're talking about the development fees. I'm sorry. Okay, so I apologize. I forget the actual development costs, development, the expenditure of the development fees, and the purposes for which those fees were incurred. Your Honor, the fees were incurred, as the record, I would suggest, plainly demonstrates, in return for the services rendered. The services rendered were the development of these two wind farms. And the evidence in the record establishes that the payments of the development fees, $50 million and $60 million respectively, were made by the companies that made them for the underlying reasons testified to by Mr. Malacherny. When he testified about the accounting records, and testified to by Ms. Schultz, and testified to by Mr. Murphy. The trial court ignored all of that testimony. The trial court focused solely on the fact that the wire transfers took place on the same day. And as we pointed out in our briefs, we submit, respectfully, that under the existing case law, it's inappropriate to focus on a single factor like that in determining that a transaction has no business purpose and no substance, and therefore a sham. And in addition to the fact that the case law teaches you can't focus on a single factor, the case law also teaches, I would submit, that one has to look at the transactions at the time of their inception. And look at the motivations of the parties at the times the transactions come into existence. And the record I submit clearly establishes that at that point in time, the business purpose was to develop wind farms, and the substance of the transaction is clear. They did develop wind farms. Can I just ask, when you say at that point, do you mean early 2012 and 2011 when these agreements were actually inked, or when the actual development work began in 2005 and 2008, respectively? Well, I mean... It was not wholly unimportant, at least to the government's theory on appeal, that if not all, then most of the actual development work predated the assignment of these $50 and $60 million values. Well, it is true that, as the record and the evidence show, and we don't dispute this, that development began before... Development of these two projects began before either the projects companies were created and before the development agreements were entered into. That's the nature of the company's business, and the record was replete with information about that. And a significant point with regard to that is, the company, as the evidence indicates, undertakes a number of development efforts, not all of which bear fruit. So, yes, it's true that there were development activities undertaken before Bishopville and California Ridge were created. There were development activities which continued after the project companies were created, and there were development activities that took place after the two development agreements were executed. It was a continuum. And so, those are the facts, and I would respectfully submit that the fact that the development agreements were executed at a time when some development, some but not all development activities had been completed, is not, does not lead to the conclusion that there was no business purpose for the development agreement and there was no economic substance to it. Now, with regard to the amount of the respective fees, the evidence in the case is to the effect that there were specific business reasons, unrelated to the financing, which led to the determination of what were appropriate fees. That can be found in the Murphy testimony, that can be found in the Schultz testimony, that can be found in the Mark Atlas testimony. The government's theory is the numbers were only selected in order to increase the indirect costs and therefore increase the grant amount, and I see my time is up. Okay, why don't we hear from the other side and we'll retain your rebuttal time. Thank you. Thank you. Mr. Carpenter? Thank you, Your Honor. May it please the court. To address Judge Toronto's question, absolutely, the claims court found that plaintiffs failed to prove that the $50 to $60 million fees were actual bona fide costs of the wind farms, given the circumstances of these round-trip, economically meaningless wire transfers, the post hoc agreements entered into long after development began, and all of these other dubious circumstances. So, the court can definitely affirm the trial court's decision without reaching the sham question, just based on a lack of any clear error in finding that they failed to carry their burden of proof on that issue. The court clearly found that plaintiffs failed to prove that the development agreements resulted in anything more than economically meaningless same-day circlings of cash between Invenergy and plaintiffs, and, of course, resulted in increased basis claims that allowed them to attempt to claim a higher Section 1603 payment. And really, the court doesn't even need to go farther than that. Well, I guess, can I just add something? Another way of stating my question is, do we even need to say that? There clearly was development work that was done by Invenergy, and there was payment from the beneficiary of that work. It's a little hard to see why the transaction in the form of payments in exchange for work had no economic consequence and was a sham. I guess what I keep focusing on in my mind, and would like to hear whether you think I'm off in this, is whether it is sufficient to say, well, of course, there was an economically substantial transaction, but the only question is whether the dollar amounts are reliable indicators of the value. And that is something that the two taxpayers here had to prove, and the CFC said no, because the dollars might have been made up after the fact in almost any amount. But if you look, and the lack of specificity in the agreement, but I guess I want to understand if you think there's something inseparable about the fee amount and the substantiality of the transaction. No, it's not inseparable, and the question I think as you framed it is a sufficient question. We would disagree as to whether it was economically substantial, but yes, the court doesn't need to reach that. Under the statute, the plainest burden is to prove that these were costs of the wind farms. And so certainly, all of those various factors that are present here and that the claims court found established that they did not prove that $50 or $60 million was an accurate cost. So, I would answer your question, yes. Okay. And can I just ask, I don't think we heard anything about this this morning, but at least in the briefs, there is some discussion of the role of U.S. banks' investment or the subsidiary of U.S. banks' investment in the two taxpayers here, and how that might have been affected by the value assigned in the 2011 and 2012 agreements. What do you make of that? Well, I think the plaintiff's argument on that isn't very clear, but essentially, they're trying to show – well, their argument is basically that because U.S. bank had become a partner in the holding companies that were the direct owners of the plaintiffs, shortly before the fees were purportedly paid, that the way that Invenergy treated that for accounting purposes somehow affected the relative partnership interest of U.S. bank and Invenergy. And I think our response to that would be, first, that they did not ever make that argument in the court below, so they waived it. And second, the claims court was fully aware of the evidence of Invenergy's accounting treatment and expressly found that it wasn't sufficient to carry plaintiffs' burden. And for one reason being that they did not show these accounting entries that they now claim demonstrated this change in partnership interest. So, there's no clear error in that. The court chose to credit the stipulations and the bank statements as to what the transaction was really about. And in any case, I think as a matter of law, paper transfers reflected in accounting entries, that's not even conclusive evidence that the transactions actually occurred, much less that they were economically meaningful. Perpetrator, I'm not recording off the top of my head. But I don't have it in front of me. Are there, in the statement of related cases, are there other cases pending that could arguably be affected by what we've decided in this case, or is this just a one-off case? Not that I'm aware of. Yes, not that I'm aware of. I have a vague memory that perhaps there is something with these same parties pending in the claims court, but it's possible that I'm also thinking of another case that I have. I'd be happy to double-check and submit something, a 28-J or something like that, to the court. I am not clearly aware that there are any other cases pending. So, yes, I mean, our position is ultimately that these transactions lack economic substance, both at the payment level and sort of as the overall development agreement transactions, as we've discussed, that the court doesn't have to reach that question in order to affirm, because ultimately it comes down to the payment level. It comes down to whether plaintiffs proved that these were bona fide costs of the wind farms, and they didn't for reasons explained by the claims court. What is your response to Mr. Hayes? To specifically answer the question, there's a caveat, but I'll come to that after. To answer the question, I think we would say that that evidence was focused on the wrong issue. Those valuations were based on what plaintiffs viewed as the fair market value of the completed wind farms and not on a specific value of services provided. The caveat to that is that we don't accept the proposition that Invenergy was some sort of outside service provider providing services in exchange for a fee. Invenergy is the developer. They do some of those development things through subsidiaries that they control, but Invenergy is the developer. If they want a wind farm, they have to do these various things to develop and have a wind farm at the end of it. They are performing services for some outside entity. They're just doing the normal development work that they would do, and the costs of that development work were separately included in the basis that they claimed and the treasury allowed. The development fees are an attempt to recover amounts that they admit are amounts in excess of the costs of those development activities. Can I just ask you about this? I was left a little bit unclear from the briefing, including the reply briefing. Maybe Mr. Hayes can address this. At least on the taxpayer side, let's just take the $50 million. Is the $50 million, does that represent the full valued price of a development service, which would include in the ordinary course the costs incurred by the development service provider as well as a profit that a development service provider would expect to make on top of its costs? Or is this $50 million, does it represent only the development service provider's profit? It represents only profit. The actual costs of the services they provided, as I said, were separately claimed as basis and allowed. They received payments for 6003 payments included, that's the actual costs. They have testimony, there are documents in which they admitted that those amounts, the $50 or $60 million, were amounts in excess of actual costs. I'm sorry to beat this, but a total of cost plus profit would be in excess of costs. I'm trying to understand if the $50 million purports to represent a proper payment to some service provider, which presumably would include a market price of the service provider, which would include the service provider's own costs and its profits, or does the $50 million represent only the service provider's profits to the exclusion of the service provider's costs? I would say the agreements don't answer that question, but other evidence on the record, testimony of Infenergy's president and memoranda that we cited in our brief, showed that the $50 or $60 million represents only profit. Okay. I think, unless there are additional questions, I will rest on our brief as to the other arguments that we've made. Thank you. Mr. Hayes, you've got five minutes left of rebuttal. Thank you, Your Honor. Let me respond to the final colloquy between the court and Mr. Carpenter first. These development agreements are, as I said at the outset, fee-for-service agreements, and they happen to be between related entities. But, as we pointed out in our brief, that's not impermissible on its face, and the developers, the Infenergy companies that were developers, are entitled to make a profit. And it's as if, by analogy... I'm sorry, Mr. Hayes, does the $50 million represent Infenergy's profit or the combination of Infenergy's costs and Infenergy's profits? Let me answer it this way, if I may, Your Honor. The $50 million fee is a cost to the project company. It is the fee that the developers charged for providing the development services. And the same is true with regard to the $60 million. It's a cost to the project. No, no, Mr. Hayes, I get that Infenergy's costs and California Ridge's costs are two different things, and California Ridge's costs include everything it has to pay to a developer, which would include the developer's costs and the developer's profits. Is the $50 million the developer's profits or the total of the developer's profits and costs? The $50 million in isolation is essentially the developer's profit. Okay. And that number, and the $60 million, this is equally true, that number is completely... That concept, first of all, that you can charge development fees and they are profit, is completely consistent with Treasury guidance with respect to the 1603 program. And the expert testimony that we put on at trial with regard to the three ways Treasury said you could value development fees, I'm using that as a shorthand. Our expert used the fair market value method and concluded and opined that the fees charged here were appropriate, given the cost of the development and the effort and the success of the project, and completely consistent, indeed below what could have been charged. So there is that point. And Treasury, in its guidance, specifically said that developers could charge markups such as this. So it is a profit to the developers and it's perfectly appropriate under the 1603 program and existing case law. And it doesn't change, I would submit, the substance of these development agreement transactions nor the business purpose of them. Can I just ask you a clarification of the terminology you're using? We've been talking about costs and we've been talking about profits. And what is a markup? Is a markup another way of describing profit? Or does markup include costs and profits? You just used the term markup, so I'm just trying to clarify where that is in the discussion. I understand, Your Honor. I understand, Your Honor. And that's a term used by Treasury in its 1603 guidance. That's why I picked the term. What I think, I submit one way to think about this is by analogy to a cost plus fee contract to construct something. I will build you a building. I will charge you the costs that I expend to build your building and I will charge you a fee on top of that for my services. I think by analogy that's what these agreements are. And to answer your question specifically, Your Honor, I think if one looks at the evidence, the Treasury guidances which are in evidence, they use the term markup. They, by way of example, say a markup or fee in the 10 to 20 percent range, 10 to 20 percent of the other development costs is appropriate. And while I won't say Treasury was very specific in its language as to what markup meant, I think a fair reading from the guidance is it means a fee charged for the services rendered. Now, because I'm short of time, unless there are questions, there are a couple of other points I'd like to make. There are two cases pending in the Court of Claims by other Invenergy entities which have been stayed pending a decision in this case. Government says that the U.S. Bank argument was not raised by us below. That's not true. It was raised in closing argument. We cite it to the appendix section in our brief and maybe our reply brief. I would also call the Court's attention to pages 40 through 49 of our principal brief in which we discuss at great length the testimony and evidence provided by, with respect to the accounting records. The government has argued that the accounting records were not shown to the trial court. I respectfully disagree with that and submit that if the court looks at those nine pages in the principal brief, the court will find that they are replete with appendix sites to testimony and documents, among which are the very accounting entries the government says the court wasn't shown. And unless there are further questions, finally, I would submit that the expert testimony provided by the plaintiffs in this case, among other things, establishes that the fees charged for development services were, to use a phrase counsel referred to, accurate costs. And I say that because if you look at the expert testimony, it explains cogently and in detail how one is to value the cost to be charged for development services and explains clearly and cogently how these particular fees were within the range of appropriate fees using fair market value analysis, which our expert opined is the appropriate methodology to use in this case. Just one quick point. You mentioned there were two cases pending before the court of federal claims. I assume the issues in those cases do not include this development fee issue. Am I right about that? They do involve development. Now, they're at their very inception, Your Honor. They were filed, I don't remember exactly when, but after this decision came down in the court of federal claims, and by agreement with the government, we stayed them pending this decision, this case. So, they're at their very infancy. There are development fees that were charged in those cases. Whether that becomes an issue of preeminence in those cases remains to be seen. But to try to answer your question correctly, there are fees in the cases, in those projects. Okay. Thank you. We thank both sides. We realize these are extraordinary circumstances, and we appreciate your cooperation and the cases submitted. Thank you. Thank you.